1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    MALI W. WILLIAMS,                      Case No.  19-cv-03988-EMC

8                    Plaintiff,

9           v.                              ORDER GRANTING DEFENDANTS'
                                            MOTION FOR SUMMARY
10   R. CONWAY, et al.,                     JUDGMENT

11                   Defendants.            Docket No. 27

12

13

14

15                     **I.      INTRODUCTION**

16          In this *pro se* prisoner's civil rights action, Mali Williams complains about the food given

17   to him during Ramadan in 2017 at Salinas Valley State Prison ("SVSP"), as well as the

18   availability of the SVSP chapel for Jumu'ah services in 2017 and 2018.  *See generally*, Docket

19   No. 12 ("First Amended Complaint").  Defendants have filed a motion for summary judgment,

20   which Mr. Williams has opposed.  *See* Docket Nos. 27, 28.

21          For the reasons discussed below, the Court **GRANTS** Defendants' motion for summary

22   judgment.

23                     **II.     BACKGROUND**

24          The following facts are undisputed unless otherwise noted.

25   A.     The Parties and Relevant Time Period

26          The relevant time period in this action is from March 2017 until June 2018.  During the

27   relevant time period, Mr. Williams was housed at SVSP.  *See* Docket No. 1.

28          The First Amended Complaint ("FAC") named five Defendants: Supervising Correctional

United States District Court
Northern District of California

1    Cook Mustafa, Correctional Food Manager Conway, Assistant Food Manager Castillo,

2    Community Resource Manager Hernandez, and Warden Foss.  *See* FAC at 2.[1]

3    B.    <u>Meals for Ramadan in 2017</u>

4        In 2017, Ramadan began at sunset on May 26 and ended at sunset on June 25.  *See* Docket

5    No. 27-07 ¶ 3 ("Conway Declaration").  Muslim inmates observing the Ramadan fast could not eat

6    during daylight hours during this timeframe.  *See generally*, FAC.  Mr. Williams is a Muslim

7    inmate, and observed Ramadan in 2017.  *See generally, id.*

8        "CDCR institutions are required to utilize a standardized, CDCR menu developed by the

9    Departmental Food Administrator (DFA) for all general population and religious meals."  Conway

10   Decl. ¶ 4.  This menu is developed by the DFA at CDCR headquarters, "verified . . . to ensure that

11   the food provided to inmates is both nutritionally sufficient and includes an adequate number of

12   calories," and then disseminated to institutions such as SVSP.  *Id*.  SVSP provided the meals

13   "dictated" by the DFA at CDCR headquarters.  *Id*. ¶ 6.

14       Per the instructions from CDCR headquarters, inmates observing Ramadan in 2017 were

15   given two sack meals that they could eat before sunrise, to replace the meals they were required to

16   skip during the day.  *See id*. ¶ 5.  Defendants represent that the sack meals included: "1 box cold

17   cereal, 2 oz. powdered milk, 1 coffee packet, 2 pieces fresh fruit, 6 slices bread, 2 pieces American

18   cheese, 1 packet peanut butter, 1 oz. jelly, 1 bag chips or pretzels, 2 packs of graham crackers, and

19   2 beverage packets."  MSJ at 5.  Together, the sack meals "total[ed] 1,674 calories, which was

20   more than the required calories for the two meals."  *Id*. at 6.  Each item was "shelf stable," so that

21   it would not spoil between delivery and consumption.  *See id*. at 5.

22       Mr. Williams does not dispute the contents of the sack meals, nor does he dispute that the

23   meals needed to be shelf stable.  *See* Opp. at 1-2.  Rather, Mr. Williams contends that the sack

24   meals lacked a "main course."  FAC at 3, Opp. at 2.  Mr. Williams grievances reveal that he deems

25   a "main course" to consist of "boil[ed] eggs, tuna, or any kind of pastries."  *See* Docket No. 26-6

26   ("Mustafa Declaration"), Ex. A at 1.

27   _____

28   [1] A fifth Defendant, Chief Deputy Warden Binkele, was named in the original complaint but
     dropped from Plaintiff's FAC.  *Compare* Docket No. 1 *with* Docket No. 12.

To support his contention that the sack meals were missing a "main course," Mr. Williams submits a copy of a CDCR Food Service Handbook from 2008.  *See* Opp., Ex. B; *see also* Opp. at 1 (relying on the 2008 Handbook).  This 2008 Handbook contains sample Ramadan menus, some of which include boiled eggs or pastries.  *See id.* at 4-5.  However, one sample menu contains neither; an acceptable menu may consist only of: "1 Juice, 1 oz. Dry Cereal, 2 pkg. Peanut Butter, 1 pkg. 4 Slice[s of] Bread, 2 pkg. Almonds, 1 Milk carton, 1 Coffee packet, 1 pkg. Jelly."  *Id.* at 5.

C.    Jumu'ah Services from March 2017 until June 2018

During the relevant time period, Mr. Williams was classified as a "Level IV, Medium A" inmate.  MSJ at 6 (citing Docket No. 27-5 ("Foss Declaration") ¶ 5).  Mr. Williams was housed on C-Yard, *see* Foss Decl. ¶ 4, which has "the highest level of custody in CDCR," Docket No. 27-4 ("Hernandez Declaration") ¶ 6.  CDCR regulations require that inmates with this level of custody be given "frequent and direct" supervision.  Foss Decl. ¶ 5.

C-Yard had both a chapel and outdoor religious grounds.  *See* Foss Decl. ¶ 4.  Due to the custody level, "prison security required that any group prayer be supervised, either by a chaplain, or by another staff member, such as a custody officer."  Hernandez Decl. ¶ 6.  Thus, "[i]nmates [we]re not permitted to be in a closed chapel area without the supervision of a religious leader present."  Foss Decl. ¶ 6.  "When a religious leader is not present or available, inmates may still be accommodated and afforded the opportunity to practice their religious activities in an alternate location such as an outdoor religious gathering area."  *Id.*

By March 2017, a Muslim religious leader was not consistently available to Muslim inmates such as Mr. Williams, because the SVSP Muslim chaplain had transferred to another facility and left his position vacant.  *See* Hernandez Decl. ¶ 5.  Defendant Hernandez recruited volunteer religious leaders, both from religious organizations outside the prison and from prison staff, to supervise the group prayer of Muslim inmates as they worshiped in the C-Yard chapel. *See id.*  However, volunteer religious leaders were only able to cover alternating Fridays.  *See id.* Defendant Hernandez explains that, while Mr. Williams could have led the religious aspect of services during this time, "he would not have been authorized to act as the supervisor of the group gathering" inside the chapel, as was required for prison security.  *Id.*

United States District Court
Northern District of California

On the Fridays when no volunteer religious leader was present, Muslim inmates were permitted to conduct group prayer on SVSP's outdoor religious grounds.  *See id*.; *see also* FAC at 6-7 (describing this situation).  "The Outdoor Religious Grounds were supervised by custodial officers assigned to monitor C-Yard, therefore no special supervision was required for inmate groups to gather at the designated Outdoor Religious Grounds."  Hernandez Decl. ¶ 7.  Mr. Williams objected to this accommodation, contending that the outdoor religious grounds were inappropriate for religious services.  *See* FAC at 7; Hernandez Dec. ¶ 8.

Mr. Williams represents that "every other religious spiritual sect" was "being afforded their weekly services in the . . . chapel."  FAC at 6; *see also* Opp. at 2 (raising this argument).  By contrast, Defendant Hernandez represents that "[a]ll other religious groups" on C-Yard had only "intermittent use" of the chapel.  Hernandez Decl. ¶ 9.

### III.     VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the complaint occurred at a prison in Monterey County, which is located within the Northern District.  *See* 28 U.S.C. §§ 84, 1391(b).  The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331.

### IV.     LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed.  R.  Civ. P.  56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . .  since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against a plaintiff

1    on the merits of his claim.  In such a situation, the moving party bears the initial burden of

2    identifying those portions of the record which demonstrate the absence of a genuine dispute of

3    material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by

4    his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,'

5    designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.

6         A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

7    based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder*

8    *v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint

9    as opposing affidavit where, even though verification not in conformity with 28 U.S.C.  § 1746,

10   plaintiff stated under penalty of perjury that contents were true and correct, and allegations were

11   not based purely on his belief but on his personal knowledge).  Mr. Williams's complaint is made

12   under penalty of perjury, *see* FAC at 2, and therefore is considered as evidence.

13        The court's function on a summary judgment motion is not to make credibility

14   determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W.*

15   *Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must

16   be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the

17   facts must be viewed in the light most favorable to the nonmoving party.  *See id.* at 631.

## V.   **DISCUSSION**

19        The Court first will analyze Mr. Williams's claims relating to Ramadan, and then will

20   discuss Mr. Williams's claims relating to Jumu'ah.

21   A.   Ramadan Claims

22        As detailed above, Mr. Williams contends that his 2017 Ramadan sack meals were missing

23   a "main course."  He contends that the absence of a "main course" violated his religious rights

24   under the First Amendment's Free Exercise Clause, RLUIPA, and the Equal Protection Clause,

25   and his Eighth Amendment right to adequate food.  *See* Docket No. 16 at 3-5 (summarizing Mr.

26   Williams's cognizable claims).

27        For the reasons stated below, each Ramadan-related claim fails.

United States District Court
Northern District of California

1            1.      Free Exercise Clause

2            The First Amendment provides that "Congress shall make no law respecting an

3    establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend I.  "The

4    first of the two Clauses, commonly called the Establishment Clause, commands a separation of

5    church and state.  The second, the Free Exercise Clause, requires government respect for, and

6    noninterference with, the religious beliefs and practices of our Nation's people."  *Cutter v.*

7    *Wilkinson*, 544 U.S. 709, 719 (2005).  Under the Free Exercise Clause, inmates "have the right to

8    be provided with food sufficient to sustain them in good health that satisfies the dietary laws of

9    their religion."  *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (quoting *McElyea v. Babbitt*, 833

10   F.2d 196, 198 (9th Cir. 1987)).  The free exercise right, however, is necessarily limited by the fact

11   of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to

12   maintain prison security.  *O'Lone v. Shabazz*, 482 U.S. 342, 348-49 (1987).  In order to establish a

13   free exercise violation, an inmate must show a defendant burdened the practice of his religion

14   without any justification reasonably related to legitimate penological interests.  *See Shakur v.*

15   *Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008).  This is because  "'[w]hen a prison regulation

16   impinges on'" any of an inmate's constitutional rights, "'the regulation is valid if it is reasonably

17   related to legitimate penological interests.'"  *Id*. at 884 (quoting *Turner v. Safley,* 482 U.S. 78, 89

18   (1987).

19           The Supreme Court has identified four factors for Courts to consider when determining

20   whether a regulation or practice is reasonably related to legitimate penological interests:

21   (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate

22   governmental interest put forward to justify it"; (2) "whether there are alternative means of

23   exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the

24   asserted constitutional right will have on guards and other inmates, and on the allocation of prison

25   resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the

26   rule at issue is an "'exaggerated response' to prison concerns."  *Turner v. Safley*, 482 U.S. 78, 89-

27

28

United States District Court
Northern District of California

1  90 (1987).[2]  The task in considering the *Turner* factors is not to balance the four factors, but,

2  rather, to determine whether the state shows a "reasonable" relation between the policy and

3  legitimate penological objectives, rather than simply a "logical" one.  *Beard v. Banks*, 548 U.S.

4  521, 533 (2006).  While all justifiable inferences must be drawn in the prisoner-plaintiff's favor

5  with respect to matters of disputed fact, the Court's inferences must accord deference to the views

6  of prison authorities in disputed matters of professional judgment.  *See id.* at 529-30.

7       Defendants are entitled to judgment as a matter of law on Mr. Williams's First Amendment

8  claim because Mr. Williams has failed to show a triable issue of fact in support of his claim that

9  Defendants burdened his practice of Islam.

10       Where a prisoner has been provided with food that allows him to "remain healthy [and] to

11  satisfy the dietary requirements of his religion," the Ninth Circuit has held that the denial of a

12  prisoner's preferred food was insufficient to burden the prisoner's religious exercise.  *Jones v.*

13  *Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015) (rejecting Free Exercise claim where prisoner was

14  unable to consume grilled meat, where consumption of grilled meat was not required by religion,

15  and "inmates were presented alternatives to grilled meat at every meal").  Here, Mr. Williams does

16  not contend that his faith requires him to consume a "main course" of "boil[ed] eggs, tuna, or any

17  kind of pastries" in his meals, does not contend that the food provided violated any tenet of Islam,

18  and has not disputed Defendants' representations that the meals provided were adequate to meet

19  his nutritional and caloric needs.  *See generally*, FAC, Opp.  Indeed, a meal missing  "boil[ed]

20  eggs, tuna, or any kind of pastries" is recommended in the very 2008 Handbook that Mr. Williams

21  relies on as a representation of what his meals ought to have included.  *See* Opp. at 1 & Ex. B.  On

22  the evidence in the record, no reasonable jury could find that Mr. Williams was not "provided with

23  food sufficient to sustain [him] in good health that satisfies the dietary laws of [his] religion."

24  *Ward*, 1 F.3d at 877 (citation omitted).

25       Even assuming arguendo that Mr. Williams's evidence had raised a triable issue of fact

26  that Defendants burdened the practice of his religion, his Free Exercise Clause claim would fail

27

28  [2] The *Turner* test applies to constitutional claims, but not the RLUIPA claim.  *See Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th Cir. 2008).

7

United States District Court
Northern District of California

because the evidence indisputably shows that the diet that was provided passes muster under the *Turner* test.

With respect to the first *Turner* factor, the undisputed evidence shows a rational and valid connection to the legitimate governmental interest of providing a shelf-stable Ramadan diet that "ensur[ed] that inmates observing the Ramadan fast had healthy and nutritionally adequate food." MSJ at 9.  CDCR has a legitimate government interest in providing religious diets which will maintain prisoners' health.  *See Brinkman v. Linderman*, 616 F. App'x 227, 229 (9th Cir. 2015) (recognizing that prisons have legitimate interest in maintaining prisoners' health); *see also Resnick v. Adams,* 348 F.3d 763, 769 (9th Cir. 2003) (first *Turner* factor satisfied because requiring inmate to fill out a standardized form to obtain a religious diet was rationally connected to the orderly administration of the common fare program in federal prison system); *Sefeldeen v. Alameida*, 238 F. App'x 204, 206 (9th Cir. 2007) ("the legitimate governmental interest is to reasonably accommodate thousands of inmates' religious dietary needs while also considering budgetary, staff, and security limitations").  The first *Turner* factor weighs in favor of Defendants.

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 89-90.  The policy of providing only shelf-stable foods during Ramadan did not deprive Mr. Williams of all means of exercising his Muslim religion.  *See O'Lone*, 482 U.S. at 352-53 (although there were no alternative means for the inmates on work detail to attend Jumu'ah services, the inmates nevertheless retained their ability to participate in other Muslim religious ceremonies and practices, and that ability supported the reasonableness of the restriction).  Indeed, Mr. Williams contends only that his dislike for the food provided caused a slight distraction from Ramadan, not that the meals prevented his participation in Ramadan.  *See generally*, FAC & Opp.  Mr. Williams retained "the ability to participate in other significant rituals and ceremonies" of his faith.  *See Ward*, 1 F.3d at 877.  The second *Turner* factor weighs in favor of Defendants.

The third *Turner* factor requires the Court to consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90.  Providing a custom Ramadan diet for Mr. Williams

United States District Court
Northern District of California

with his preferred "main course" items may have caused him to become ill if those items were not shelf stable, may not have complied with the nutrition guidelines which CDCR headquarters had verified were fulfilled, and also would have adversely affected the allocation of jail resources by disrupting the simplified food services system beneficial for feeding all inmates.  Although Mr. Williams cites a 2008 Handbook which included boiled eggs or pastries among the acceptable meal choices, he neither shows nor alleges that such menus were approved by the DFA at CDCR Headquarters in 2017, for distribution at individual prisons by officials such as Defendants.  *See generally*, FAC, Opp.  The third *Turner* factor weighs in favor of Defendants.  *See DeHart v. Horn*, 390 F.3d 262, 271-72 (3d Cir. 2004) (providing religious vegan diet would burden prison administration because it would require specialized ordering and preparation of food and individualized preparation of meals in kitchen designed for bulk food preparation).

The fourth *Turner* factor requires the Court to consider whether there is an "absence of ready alternatives" to the prison policy.  *Turner*, 482 U.S. at 90.  The burden is on the inmate challenging the regulation to show that there are obvious, easy alternatives to the regulation.  *See O'Lone*, 482  U.S. at 350; *see also Mauro v. Arpaio*, 188 F.3d 1054, 1063 (9th Cir. 1999).  Here, Mr. Williams has not put forth a ready alternative to Defendants' Ramadan meal plan that would accommodate his specialized food preferences, while accommodating the need for shelf stable foods that could be retained in an inmate's cell overnight.  *Cf. Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997)  (reversing and remanding on free exercise claim because lower Court had not taken into consider evidence that a variety of foodstuffs could be assembled to provide meals that were consistent with kosher diet request where "most of these things are 'off-the-shelf' and nothing in the record suggests that the cost would be appreciable.").  As noted above, the 2008 Handbook that Plaintiff attaches to the Opposition does not include menus approved by CDCR Headquarters in 2017.  The fourth *Turner* factor weighs in Defendants' favor.

Having considered the *Turner* factors, the Court concludes that Mr. Williams has not raised a triable issue of fact that his right to free exercise of religion was improperly impinged upon by Defendants' policy.  Defendants are entitled to judgment in their favor on Mr. Williams's First Amendment claim.

United States District Court
Northern District of California

1       2.       RLUIPA

2           Prisoners' religious freedoms also are protected by the Religious Land Use and

3   Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1.  RLUIPA provides: "No

4   government shall impose a substantial burden on the religious exercise of a person residing in or

5   confined to an institution, as defined in section 1997 [which includes state prisons], even if the

6   burden results from a rule of general applicability, unless the government demonstrates that

7   imposition of the burden on that person (1) is in furtherance of a compelling governmental

8   interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

9   42 U.S.C. § 2000cc-1(a).  For an RLUIPA claim, the plaintiff-prisoner must show that the

10  government has imposed a substantial burden on his religious exercise, which is a burden that

11  imposes "significantly great restriction or onus upon such exercise."  *San Jose Christian Coll. v.*

12  *Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir. 2004).  As with a Free Exercise Clause claim, under

13  RLUIPA, "a prisoner's request for an accommodation of a religious practice must be sincerely

14  based on a religious belief and not some other motivation."  *Holt v. Hobbs*, 135 S. Ct. 853, 862

15  (2015).

16          The Ninth Circuit has held that a "substantial burden" on "religious exercise" is one that

17  imposes "a *significantly great* restriction or onus upon such exercise."  *Hartmann v. California*

18  *Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1125 (9th Cir. 2013) (quoting *San Jose Christian*

19  *College*, 360 F.3d at 1034) (emphasis added).  The plaintiff bears the burden of coming forward

20  with evidence demonstrating the state's action or policy constituted a substantial burden on his

21  exercise of religion.  *Warsoldier v. Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005).  The focus of

22  this initial inquiry necessarily is on the manner in which the plaintiff's religious exercise is

23  impacted, rather than on the reasonableness of the facility's policy or regulation.  *Id.* at 995.  Once

24  the plaintiff has met his initial burden of showing a substantial burden on his exercise of religion,

25  the burden shifts to the government to show that the burden imposed is in furtherance of a

26  "compelling" government interest (rather than simply a legitimate penological interest), and that it

27  achieves the compelling interest by the least restrictive means.  *See* 42 U.S.C. § 2000cc-1(a);

28  *Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008).

Here, Mr. Williams falls at the first hurdle because Defendants did not burden Mr.

Williams's practice of his religion, much less substantially burden it. Mr. Williams wanted a

Ramadan diet with attributes different from the one served to him, one which would contain

"boil[ed] eggs, tuna, or any kind of pastries." The evidence is undisputed, however, that these

preferences were personal preferences rather than religion-based preferences. In such instances,

courts repeatedly have rejected a prisoner-plaintiff's RLUIPA or First Amendment claim.[3] The

features of the diet that Mr. Williams found disagreeable simply did not impose "'a significantly

great restriction or onus,'" *Hartmann*, 707 F.3d at 1125, upon the exercise of his Muslim religion.

No reasonable jury could conclude, on the evidence in the record, that the failure to

---

[3] *See, e.g.*, *Jones v. Williams*, 791 F.3d 1023 (9th Cir. 2015 (rejecting Free Exercise claim where prisoner was unable to consume grilled meat, where consumption of grilled meat was not required by religion, and "inmates were presented alternatives to grilled meat at every meal"); *Kretchmar v. Beard*, 241 F. App'x 863 (3d Cir. 2007) (RLUIPA and First Amendment claims were properly rejected because non-rotating Kosher menu served cold and that did not comply with prison's general menu operating guidelines that required a rotating menu and two hot meals per day did not substantially burden inmate's religious exercise); *id.* at 865 (while plaintiff "may prefer a wider variety of hot meals, the diet he currently receives" – which was religiously compliant and met his nutritional needs – "is not the type of burden that puts substantial pressure on him to modify his behavior and violate his beliefs"); *DeHart v. Horn*, 227 F.3d 47, 52 (3d Cir. 2000) ("if a prisoner's request for a particular diet is *not* the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request, and there is no occasion to conduct the *Turner* inquiry"); *Walters v. Santa Clara Dep't of Corr.*, No. C-12-2799 EMC (PR), 2013 WL 5292042, at *6 (N.D. Cal. Sept. 19, 2013) (rejecting claim where prisoner-plaintiff wanted a religious diet that contained more meat and desserts than the existing diet); *Riley v. DeCarlo*, 2012 WL 4378569, *5 (W. D. Penn. 2012) (granting summary judgment for Defendants on plaintiffs' religious freedom claims where no-animal-product-diet offered indisputably excluded all the ingredients plaintiff claimed to be religiously unacceptable; "[p]laintiff seems to be attempting to force Defendants to cater to his ill-defined personal preferences, which is not cognizable under the Free Exercise Clause"); *Gailbreath v. Covert*, 2011 WL 3475544, *7-8 (W. D. Penn. 2011) (finding plaintiff's First Amendment freedom of religion and RLUIPA claims to be without merit where plaintiff requested and received a non-pork diet requested for religious reasons but did not receive a vegetarian diet he requested for non-religious reasons); *see also id.* at 8 (vegetarian diet requested "'for cholesterol reasons'" was "not religious in nature" and therefore the "denial of the same did not place any substantial burden on Plaintiff's religious exercise"); *Moore v. Cucchi*, 2011 WL 4594907, *3-*4 (D. N.J. 2011) (granting summary judgment against plaintiff on his RLUIPA and First Amendment claims because plaintiff did not allege facts showing that the non-meat diet he was served violated his Buddhist beliefs even though that diet did not satisfy his personal preference for a lacto-vegetarian diet; "an inmate has no constitutional right to a diet based on personal preference"); *Strope v. Cline*, 2010 WL 3721700, *7 (D. Kan. 2010) ("it is 'axiomatic that the free exercise clause of the first amendment does not offer its protections to mere personal preferences;'" granting summary judgment against plaintiff on his First Amendment and RLUIPA claims where plaintiff had expressed no religious necessity for the foods omitted from the diet, or religious prohibition against the repetitive nature of the menu offered).

provide a Ramadan diet that included eggs, tuna, and pastries amounted to a substantial burden on Mr. Williams's exercise of his Muslim religion.  Accordingly, Defendants are entitled to judgment as a matter of law on the RLUIPA claim.

>   3.   Equal Protection Clause

Mr. Williams contends that prison officials treated him differently from other inmates, in violation of his rights under the Equal Protection Clause of the Fourteenth Amendment. Specifically, he appears to contend that prison officials provided inmates not practicing Ramadan with a "main course" at every meal.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  In the prison or jail context, the Equal Protection Clause requires that an inmate who is an adherent of a minority religion be afforded a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts," *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (Buddhist inmates must be given opportunity to pursue faith comparable to that given Christian inmates), as long as the inmate's religious needs are balanced against the reasonable penological goals of the prison, *O'Lone*, 482 U.S. at 349.  An inmate cannot prevail on his equal protection claim "if the difference between the Defendants' treatment of him and their treatment of [other] inmates is 'reasonably related to legitimate penological interests.'" *Shakur*, 514 F.3d at 891 (citations omitted).

Mr. Williams has failed to show a triable issue of fact in support of his equal protection claim.  Mr. Williams fails to show differential treatment, and thus has failed to establish the first prong of an equal protection claim.

Defendants contend that Mr. Williams's menu for the Ramadan fast should be compared only to the menu provided to other inmates fasting for Ramadan, and that this comparison shows Mr. Williams was not treated differently.  *See* MSJ at 13.  This argument fails to address Mr. Williams's claim that Muslim inmates were treated differently than non-Muslim inmates.

United States District Court
Northern District of California

1    However, the Court agrees with Defendants that it is not quite appropriate to compare the menu

2    provided to fasting Muslim inmates with that provided to non-fasting non-Muslim inmates; it

3    simply adds too many variables.  Rather, to determine whether Mr. Williams was treated

4    differently based on his Muslim faith, the appropriate comparison is between what was provided

5    to inmates fasting for Ramadan, and what was provided to inmates fasting as an act of worship

6    under a different faith.  *See, e.g., Aiello v. West*, 207 F. Supp. 3d 886, 903 (W.D. Wis. 2016) (no

7    equal protection claim stated where defendants made change to Kosher meal plan, where change

8    was for secular reasons and "was made to treat different religious diets *more* similarly") (emphasis

9    in original).  Mr. Williams has introduced no evidence to show that "boil[ed] eggs, tuna, or any

10   kind of pastries" were included in the sack meals given to inmates fasting under a religion other

11   than Islam, or to inmates fasting for non-religious reasons, and so has not shown that he was

12   treated differently from similarly situated inmates based on his Muslim faith.  Because he has not

13   shown this differential treatment, Mr. Williams has failed to establish an essential element of his

14   claim and summary judgment is appropriate.  *See Celotex*, 477 U.S. at 322-23 (Courts grant

15   summary judgment "against a party who fails to make a showing sufficient to establish the

16   existence of an element essential to that party's case, and on which that party will bear the burden

17   of proof at trial . . .  since a complete failure of proof concerning an essential element of the

18   nonmoving party's case necessarily renders all other facts immaterial.").

19        Moreover, even if the Court were to compare Mr. Williams to non-similarly-situated, non-

20   fasting inmates, summary judgment would be appropriate because the difference in treatment

21   between inmates fasting for Ramadan and inmates who are not fasting is "'reasonably related to

22   legitimate penological interests.'"  The legitimate penological interests of maintaining inmate

23   nutrition, providing meals that would not spoil, and espousing a simplified and efficient food

24   service plan, justified the decision not to provide to fasting inmates "boil[ed] eggs, tuna, or any

25   kind of pastries" in addition to the Ramadan diet (which, as noted above, satisfied the dictates of

26   the Muslim religion).  *See supra* V.A.1 (discussing these penological interests as part of the

27   Court's Turner analysis).

28        Because Mr. Williams fails to show that he was treated differently from similarly situated

inmates, and because the difference in treatment between Mr. Williams and non-fasting inmates is justified for the reasons discussed above, the Court concludes that Mr. Williams has not raised a triable issue of fact that his right to equal protection was improperly impinged upon by Defendants.  Defendants are entitled to judgment in their favor on Mr. Williams's Fourteenth Amendment Equal Protection Clause claim.

      4.    <u>Eighth Amendment</u>

Adequate food is a basic human need protected by the Eighth Amendment.  *See Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), *amended*, 135 F.3d 1318 (9th Cir. 1998).  The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing.  *See Graves v. Arpaio*, 623 F.3d 1043, 1050 (9th Cir. 2010) (per curiam) (8th Amendment requires that pretrial detainees be given food that meets or exceeds the Department of Agriculture's *Dietary Guidelines*); *see, e.g., Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1259 (9th Cir. 2016) (summary judgment properly granted for defendants because plaintiff failed to provide any evidence that the jail's pregnancy diet, which consisted of regular inmate diet plus a prenatal vitamin and an additional 32 ounces of milk per day, was nutritionally insufficient or inedible); *LeMaire v. Maass,* 12 F.3d 1444, 1456 (9th Cir. 1993) (temporary diet of Nutraloaf, which exceeds inmate's daily nutritional requirements, does not violate 8th Amendment).  Food that is spoiled and water that is foul is deemed inadequate to maintain health.  *See Keenan*, 83 F.3d at 1091; *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1412 (N.D. Cal. 1984) (Nutritionally complete food served to inmates is deficient under constitutional standards if it is prepared under conditions so unsanitary as to make it unwholesome and a threat to inmates who consume it.).

Here, Defendants represent, and Mr. Williams does not dispute, that the meals provided to him were nutritionally and calorically sufficient to maintain health, were approved by a dietician, and were mandated by CDCR headquarters.  *Compare* MSJ at 9-10 ("The pre-dawn meal only included items that were shelf-stable, and included all approved food from the CDCR dietician in order to meet the recommended number of calories.") (citing Conway Decl. at ¶¶ 5-6, Decl. Castillo Decl. at ¶¶ 5-7, Decl. Mustafa Decl. at ¶¶ 5-7) *with* Opp. (raising no arguments regarding

14

1    the safety, cleanliness, or nutritional adequacy of the food).  Because Mr. Williams has not

2    presented any evidence that the Ramadan meals were nutritionally or calorically insufficient, he

3    has failed to carry his summary judgment burden.

4        For the aforementioned reasons, Defendants are entitled to judgment on Mr. Williams's

5    Eighth Amendment claim.

6    B.    Jumu'ah Claims

7        Mr. Williams claims that his rights were violated when he was forced to attend Jumu'ah

8    services in the recreation yard every other week, rather than being able to attend services in the

9    chapel every week.  He contends that attending Jumu'ah services in the Outdoor Religious

10   Grounds violated his religious rights under the First Amendment's Free Exercise Clause,

11   RLUIPA, and the Equal Protection Clause.  *See* Docket No. 16 at 5-6 (summarizing Mr.

12   Williams's cognizable claims).

13       As a preliminary matter, the Court notes that Mr. Williams appears not to recognize a

14   distinction between roles.  Defendants state that Mr. Williams could have sought permission to

15   lead services in the *spiritual* sense, but could not be authorized to supervise services in the *custody*

16   sense.  *See* Hernandez Decl. ¶ 6.  On days when no staff member was available to supervise indoor

17   services in the *custody* sense, inmates were required to gather outside where they could be

18   observed by custodial staff on duty.  *See id.*

19       For the reasons stated below, each Jumu'ah-related claim fails.

20       1.    First Amendment and RLUIPA Claims

21       The Ninth Circuit repeatedly has rejected First Amendment and RLUIPA claims where an

22   inmate has been allowed to attend group services, even if those services were not conducted in a

23   chapel.  In *Jackson v. Gomez*, the prisoner-plaintiff was incarcerated at Corcoran State Prison

24   ("CSP") and was a member of the Nation of Islam.  *See* 142 F.3d 443 at *1 (9th Cir. 1998)

25   (unpublished).  CSP had a policy which "prohibit[ed] religious meetings in the chapel, unless the

26   prisoners ha[d] non-inmate supervision."  *Id.*  Unlike the instant action where Mr. Williams was

27   able to worship in the chapel every other week, in *Jackson* the prisoner-plaintiffs were *never*

28   permitted to hold services in the chapel and *always* required to hold services in the prison yard,

United States District Court
Northern District of California

15

because "non-inmate supervision . . . was unavailable to the Nation of Islam prisoners" at CSP. *Id*. Nevertheless, the Ninth Circuit held that "prison officials did not violate any of the plaintiffs' 'clearly established' rights," because the prisoners had been afforded a reasonable opportunity to practice their faith, and because CSP was not required to provide chapel access to the relatively small group of prisoners who belonged to the Nation of Islam. *Id*. at *2 (upholding grant of qualified immunity). Similarly, in *Robbins v. Grant*, prison officials denied the Buddhist prisoner-plaintiff permission to use the chapel to meet with another Buddhist inmate. *See* 988 F.2d 121 at *1 (9th Cir. 1993) (unpublished). Prison officials explained that security concerns prevented unsupervised use of the chapel. *See id*. As in the instant action, although the Buddhist inmates could not use the chapel unsupervised, they were allowed to conduct religious services "in another appropriate room where security officers already were present." *Id*. The Ninth Circuit held that prison officials' denial of use of the chapel was permissible given, among other things, "the availability of alternative areas, if needed, for congregation." *Id*. at *2. Similarly, in *Nazarzai v. Cnty. of Orange*, the detainee-plaintiff argued that he had been denied the right to attend chapel and weekly religious services. 845 F. App'x 559, 560 (9th Cir. 2021). The Ninth Circuit held that, because he "was provided access to religious services and a religious advisor [and] was also able to pray daily," his rights had not been violated even though he was not allowed to attend religious services on a weekly basis. *Id*.

Indeed, the Ninth Circuit has rejected claims where the prisoner-plaintiff was not given the opportunity to attend *any* services, whether inside the chapel or outside, so long as he was able otherwise to practice his religion. In *Sutton v. Vail*, the prisoner-plaintiff was denied access to any group religious services, because no supervisor was available. *See* No. 11-35513, 2012 WL 5951464, at *1 (9th Cir. Nov. 27, 2012). Nevertheless, the Ninth Circuit concluded that the prisoner-plaintiff had not shown "that defendants' actions substantially burdened his ability to practice his religion." *Id*. In *Jones v. Bradley*, the prisoner-plaintiff was a pastor in the Universal Life Church and was denied access to the prison chapel because, among other things, he lacked an outside sponsor. *See* 590 F.2d 294, 295, 296 (9th Cir. 1979). Nevertheless, the Ninth Circuit "conclude[d] that he was not denied 'a reasonable opportunity of pursuing his faith.'" *Id*.

United States District Court
Northern District of California

1    Applying these decisions here, Mr. Williams's claim that his sporadic chapel access

2    violated his First Amendment and RLUIPA rights fails.  Mr. Williams was permitted to attend

3    weekly Jumu'ah services, half of which occurred in the chapel and half of which occurred outside.

4    Following *Jackson*, in which the prisoner-plaintiff was forced to conduct *all* worship outside, Mr.

5    Williams's sporadic access to the chapel did not burden his ability to practice his religion.

6    The *Turner* factors also counsel in favor of rejecting Mr. Williams's Jumu'ah claims.  As

7    to the first *Turner* factor,  Defendants represent, and Mr. Williams appears to concede, that

8    Muslim inmates' sporadic access to the chapel was due to the lack of an "assigned Imam/ Muslim

9    spiritual leader/ chaplain," FAC at 6; MSJ at 16-17, and that such a supervisor was required for

10   prison security.  *See* Foss Decl. ¶¶ 5-6, Hernandez Decl. ¶ 6.  The legitimate penological interest

11   of maintaining prison security justified the decision not to permit inmates to congregate in a closed

12   environment without custodial supervision.  *See Shakur*, 514 F.3d at 891 (An inmate cannot

13   prevail on his equal protection claim "if the difference between the Defendants' treatment of him

14   and their treatment of [other] inmates is 'reasonably related to legitimate penological interests.'").

15   The second *Turner* factor, whether Mr. Williams had alternative means of exercising his right,

16   also counsels in favor of rejecting Mr. Williams's claim: as noted above, Mr. Williams was able to

17   attend group Jumu'ah services on the Outdoor Religious Grounds, which the Ninth Circuit has

18   held sufficient.  As to the third *Turner* factor, were prison officials to have allowed Muslim

19   inmates unsupervised access to the chapel, the impact on guards and other inmates would have

20   been considerable: allowing inmates at the highest custody level to congregate unsupervised risks

21   those inmates hurting one another, plotting together to hurt a guard or otherwise undermine prison

22   security, and would additionally afford Muslim inmates preferential treatment not afforded to

23   other groups.  Finally, the fourth *Turner* factor asks whether the rule at issue is an "'exaggerated

24   response' to prison concerns."  *Turner* 482 U.S. at 89-90.  As the Ninth Circuit repeatedly has

25   recognized the validity of prison regulations requiring supervision in the chapel, and as the instant

26   regulation is actually less burdensome than some of those approved by the Ninth Circuit, the Court

27   cannot hold that the rule is an "exaggerated response."

28   For these reasons, Mr. Williams's First Amendment and  RLUIPA claims fail.

2.     Equal Protection Claim

As noted above, the Equal Protection Clause requires that an inmate who is an adherent of a minority religion be afforded a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz*, 405 U.S. at 322.  However, this opportunity is qualified by the need to balance the inmate's religious needs against the reasonable penological goals of the prison, *O'Lone*, 482 U.S. at 349.  The Supreme Court has provided an additional qualifier:

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel.  A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand.  But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty.

*Cruz*, 405 U.S. at 322 n.2.  In other words, equal protection "does not mean . . . that all prisoners must receive identical treatment and resources."  *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1123 (9th Cir. 2013).

Applying the limitations from *O'Lone* and *Cruz*, the Ninth Circuit repeatedly has rejected Equal Protection claims similar to that brought by Mr. Williams.  In *Allen v. Toombs*, the Ninth Circuit considered Native American prisoner-plaintiffs' access to a Pipe Ceremony.  *See* 827 F.2d 563, 565 (9th Cir. 1987).  The prisoner-plaintiffs "note[d] that Catholic and Protestant DSU inmates can obtain spiritual guidance immediately upon request because the state provides full-time chaplains of those denominations on the prison premises."  *Id.* at 568.  By contrast, Native American prisoners were served only by volunteer Pipe Bearers.  *See id.*  "When no outside volunteer is available, plaintiffs argue Native American inmates are denied any access to spiritual guidance, and are therefore denied opportunities to pursue their faith comparable to those afforded to Catholics and Protestants."  *Id.*  The Ninth Circuit held that the prison had not violated the prisoner-plaintiffs' right to equal protection because "the prison administration is not under an affirmative duty to provide each inmate with the spiritual counselor of his choice," and because the prison "permits outside religious leaders to enter the DSU to address the religious needs of

18

1   Native American inmates," which gave Native American inmates "a reasonable opportunity . . . to

2   exercise their faith. " *Id.* at 569.  *See also Hartmann*, 707 F.3d at 1124 (that the prison "provides

3   Plaintiffs with access to a volunteer Wiccan chaplain when one is available" was fatal to the

4   prisoner-plaintiffs' equal protection claim); *Mayweathers v. Gomez*, No. C94-3297 FMS, 1997

5   WL 601428, at *2 (N.D. Cal. Sept. 19, 1997) (failure to provide a Muslim cleric did not violate

6   equal protection, where "a variety of religious services" were provided to permit Muslim inmates

7   to practice their faith).

8         Here, as in *Allen*, Mr. Williams was given a "reasonable opportunity of pursuing his faith."

9   *Cruz*, 405 U.S. at 322.  He was free to worship individually, or outside as part of a group.  He was

10  allowed to practice his religion freely, and was afforded the services of a non-inmate supervisor –

11  and the concomitant access to the chapel – when one was available.  *See generally*, FAC

12  (conceding that Muslim inmates were able to worship in the chapel when a supervisor was

13  available).  In addition, not only did Defendants give Mr. Williams access to outside religious

14  leaders as in *Allen*, here Defendant Hernandez went further and actively sought volunteers from

15  the community to fill the gap left by the Muslim Chaplain's transfer.  *See* Hernandez Decl. ¶ 5.

16  Indeed, Plaintiff does not dispute that Defendant Hernandez made these efforts.  *See generally*,

17  Opp.  It is clear from the record that prison officials made a good-faith effort to accommodate

18  Muslim prisoners' rights.  *See Freeman*, 125 F.3d at 737.

19        Further, even if there was unequal treatment, [4] Defendants' actions pass muster under the

20  *Turner* test.  Prisons and jails need not provide identical facilities or services to different faiths,

21  but must make good faith accommodation of the inmates' rights in light of practical

22  considerations.  *See Freeman*, 125 F.3d at 737.  Here, after the Muslim chaplain transferred to

23  another facility, Defendants sought to hire another Muslim chaplain to supervise indoor religious

24  services and, in the interim, recruited volunteers to do so.  Plaintiff does not argue that any of

25  these efforts were made in less than good faith.  *See generally*, FAC, Opp.  The same *Turner*

26

27   ―――――――――――――――

[4] Defendants have introduced evidence – which Mr. Williams does not dispute – that the

28  supervisor requirement applied to all religions, not just to Islam.  *See* Hernandez Decl. ¶ 6 ("prison
security required that any group prayer be supervised, either by a chaplain, or by another staff
member"), ¶ 9 ("All other religious groups had intermittent use of the chapel as well.").

analysis that requires rejection of Mr. Williams's First Amendment and RLUIPA claims is fatal to Mr. Williams's Equal Protection Claim.  *See supra* V.B.1.

Having considered Ninth Circuit precedent and the *Turner* factors, the Court concludes that Mr. Williams has not raised a triable issue of fact that his equal protection rights were violated.  Defendants are entitled to judgement on Mr. Williams's Equal Protection claim.

## VI.        <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED.**

This order disposes of Docket No. 27.  The Clerk is instructed to enter Judgment and close the case.

**IT IS SO ORDERED**.

Dated: July 29, 2022

_____
EDWARD M. CHEN
United States District Judge